United States Court of Appeals,

Fifth Circuit.

No. 95-60027.

SGS CONTROL SERVICES;  CNA Insurance Company, Petitioners,

v.

DIRECTOR, OFFICE OF WORKER'S COMPENSATION PROGRAMS, U.S. DEPARTMENT of LABOR;  Francis Barrios, Respondents.

June 27, 1996.

Petition for Review of an Order of the Benefits Review Board.

Before POLITZ, Chief Judge, and DeMOSS and DENNIS, Circuit Judges.

DENNIS, Circuit Judge.

An administrative law judge (ALJ) found that Francis Barrios was permanently and totally disabled due to a work-related injury covered by the Longshore and Harbor Workers' Compensation Act (LHWCA) and awarded benefits accordingly.  The Benefits Review Board (the Board) affirmed the judgment.  Petitioners, SGS Control Services (SGS) and CNA Insurance Co., seek review of both the finding of permanent and total disability, and the determination of compensation rate.  For the reasons assigned, we affirm.

I. *Facts and Procedural History*

On January 8, 1982, claimant, Francis Barrios, injured his back in the course and scope of his employment as a bulk cargo commodities inspector for SGS.  Following conservative treatment for back pain, Mr. Barrios was referred to a neurosurgeon, Dr. Jackson, who diagnosed ruptured discs at L5-S1 and L4-L5, and recommended surgery.  A second opinion from an orthopedic surgeon, Dr. Kinnett supported this recommendation and, in September 1982, Dr. Kinnett performed a laminectomy and fusions at L-4-L5 and L5-S1.  Although Mr. Barrios briefly returned to work in 1984, his condition worsened and he underwent a second operation, a discectomy and fusion of the affected area, performed by Dr. Jackson in March 1985.

On June 18, 1986, at Mr. Barrios' request, Dr. Jackson wrote a note stating that Mr. Barrios had reached maximum medical improvement and discharging him to return to his previous full-time

work without restrictions. At his deposition in this matter, Dr. Jackson qualified this release, stating that when he wrote the note he believed that Mr. Barrios would be performing light duty work, that he would never have released him to do heavy industrial work and that the release was intended to be a trial return to employment. Mr. Barrios continued to complain of severe pain and, on November 17, 1987, Dr. Jackson performed more imaging tests on him. A myelogram suggested possible abnormalities at the L3-L4 level; a CAT Scan indicated a disc bulge at the same level and a possible herniated nucleus pulposus that had not been detected in the 1985 tests performed. Another scan and an MRI conducted in July 1988 revealed a bony spur encroaching into the neural foramen that was the likely source of Mr. Barrios' pain. Dr. Jackson opined at his deposition that the spur related to the 1985 fusion and that Mr. Barrios was disabled from performing any work due to pain. Dr. Jackson was hesitant about another surgery, stating that there was a possibility that the spur would eventually be absorbed and cease to be a problem, but, if not, surgery would be required.

On September 9, 1987, at the request of SGS, Mr. Barrios was also examined by Dr. Juneau, an orthopedist, who was unable to find any clear objective symptoms concerning his condition. Dr. Juneau concurred, however, with Dr. Jackson's findings that Mr. Barrios has a 25% overall disability. Dr. Juneau opined that Mr. Barrios should refrain from lifting weight in excess of 75 pounds or engaging in frequent bending or stooping and should avoid activity that would place strain on his back. Dr. Juneau's report reflects that he performed a physical examination of Mr. Barrios and reviewed X-rays of his spine. There is no indication, however, that Dr. Juneau performed or reviewed any other imaging tests in rendering his opinion.

SGS voluntarily paid temporary total disability compensation from January 13, 1982 until July 16, 1986, at which time it ceased payment of compensation based on Dr. Jackson's June 18 work release. Mr. Barrios filed a claim seeking continuing total disability compensation under the LHWCA. Following a hearing, the ALJ awarded Mr. Barrios temporary total disability benefits from January 8, 1982 until July 15, 1986, permanent total disability benefits thereafter, based on an average weekly wage of $986 (the figure employed by SGS in making its voluntary compensation payments), and medical benefits. With respect to its finding of permanent total disability, the ALJ determined

that Mr. Barrios had reached maximum medical improvement as of July 15, 1986, as his disability had been lengthy and the time of recovery was doubtful and indefinite, and found that SGS's proffered vocational evidence was insufficient to demonstrate the availability of alternate employment. In addition, the ALJ determined that Mr. Barrios' average weekly wage was the amount on which SGS had based its voluntary benefits payments, rejecting SGS's argument that an economic decline in Mr. Barrios' area of employment should be taken into account in determining his average weekly wage. On appeal, the Board affirmed the award of permanent disability benefits. SGS and its insurer petitioned this court for review of that order pursuant to 33 U.S.C. § 921(c).

## II. *Discussion*

Petitioners argue that the lower tribunals erred in several respects: (1) the average weekly wage was improperly calculated because it did not take into account a reduction in earning capacity attributable to a post-injury decline in economic conditions; (2) the ALJ improperly awarded permanent and total disability relief when Mr. Barrios sought only temporary total disability payments; (3) the evidence did not establish that Mr. Barrios was permanently and totally disabled; and (4) there was an adequate showing of alternate employment.

This court reviews a decision of the Board under the same standard the Board applies to review a decision of the ALJ: Whether the decision is supported by substantial evidence and is in accordance with the law. *Empire United Stevedores v. Gatlin,* 936 F.2d 819, 822 (5th Cir.1991) (citations omitted). We may not substitute our judgment for that of the ALJ, nor reweigh or reappraise the evidence, but may only determine whether evidence exists to support the ALJ's findings. *Id.* (citations omitted). All doubts are to be construed in favor of the employee to effectuate the LHWCA's remedial purposes. *Id.* (citation omitted).

## A. *Determination of Weekly Wage*

Petitioners initially challenge the ALJ's determination of the weekly compensation rate used as a basis for establishing Mr. Barrios' compensation payments. Under the LHWCA, compensation for permanent or total disability is derived from the claimant's average weekly wage. 33 U.S.C. §§ 906 and 910. The determination of average weekly wage is governed by 33 U.S.C. § 910, which

provides in pertinent part:

### § 910. Determination of pay

Except as otherwise provided in this Act, the average weekly wage of the injured employee at the time of the injury shall be taken as the basis upon which to compute compensation and shall be determined as follows:

(a) If the injured employee shall have worked in the employment in which he was working at the time of the injury, whether for the same or another employer, during substantially the whole of the year immediately preceding his injury, his average annual earnings shall consist of three hundred times the average daily wage or salary for a six-day worker and two hundred and sixty times the average daily wage or salary for a five-day worker, which he shall have earned in such employment during the days when so employed.

(b) If the injured employee shall not have worked in such employment during substantially the whole of such year, his average annual earnings, if a six-day worker, shall consist of three hundred times the average daily wage or salary, and, if a five-day worker, two hundred and sixty times the average daily wage or salary, which an employee of the same class working in similar employment in the same or a neighboring place shall have earned in such employment during the days when so employed.

(c) If either of the foregoing methods of arriving at the average annual earnings of the injured employee can not reasonably and fairly be applied, such average annual earnings shall be such sum as, having regard to the previous earnings of the injured employee in the employment in which he was working at the time of the injury, and of other employees of the same or most similar class working in the same or most similar employment in the same or neighboring locality, or other employment of such employee, including the reasonable value of the services of the employee if engaged in self-employment, shall reasonably represent the annual earning capacity of the injured employee.

33 U.S.C. § 910(a)-(c). Once the average annual earnings are computed, they are divided by 52 to arrive at the average weekly wage. 33 U.S.C. § 910(d).

Although conceding that Mr. Barrios' average weekly wage is susceptible of calculation under 33 U.S.C. § 910(a), petitioners argue that the ALJ should have applied § 910(c) to arrive at the appropriate compensation rate in order to take into account an alleged economic decline in Mr. Barrios' field of employment. In essence, petitioners' position is that § 910(a) "can not reasonably and fairly be applied" when economic conditions in the claimant's field of employment suffer a downward turn subsequent to the disabling accident. Neither the language of the Act nor the case law interpreting it support such a reading of § 910.

The starting point for analysis of this question is the statutory language. *Metropolitan Stevedore Company v. Rambo,* --- U.S. ----, ----, 115 S.Ct. 2144, 2147, 132 L.Ed.2d 226 (1995). Section 910 provides three methods for determining "the average weekly wage of the injured

employee *at the time of the injury....*"  33 U.S.C. § 910 (emphasis added).  Subsections (a) and (b) are the basic formulae for determining average annual income;  only if either provision "can not reasonably and fairly be applied" may the ALJ turn to the method set forth in subsection (c).  As this court has recognized, "the prime objective of section 10(c) is to "arrive at a sum that reasonably represents a claimant's annual earning capacity *at the time of the injury.*' "  *Empire United Stevedores v. Gatlin,* 936 F.2d 819, 823 (5th Cir.1991) (emphasis added).

There is nothing in the statute to suggest that either subsection (a) or (b) may be deemed inapplicable solely on the basis of economic fluctuations in the claimant's field of employment subsequent to the time of the injury or that such economic fluctuations should inure to the benefit of the employer.  Indeed, the statute's language supports the opposite conclusion.  Subsection (c) provides that the claimant's earning capacity may be determined by looking to "other employment" (including self-employment of the claimant) besides the employment in which the claimant was injured—language recognizing that an employee's ability to supplement his earnings in one field through additional work elsewhere may be crippled by his disability.  In addition, although the statute provides for yearly cost-of-living adjustments that are assessed as the lesser of 5% or the percentage by which the national weekly wage has increased in the past year, 33 U.S.C. § 910(f), it shields compensation recipients from downward economic turns in the nation's employment market.  Subsection (g) states with respect to the cost-of-living adjustments that "[n]o adjustment of less than $1 shall be made, but in no event shall compensation or death benefits be reduced."  33 U.S.C. § 910(g).  Petitioners point to nothing in the statute to support a reading of subsections (a)-(c) that so conflicts with Congress' evident intent in subsections (f) and (g) to provide claimants a limited increase in their payments based on a nationwide increase in earnings, but to prohibit a comparable decrease.[1]

---

[1]Although resort to legislative history is of marginal significance when a statute's language and structure demonstrate congressional intent, *Metropolitan Stevedore Company v. Rambo,* --- U.S. ----, ----, 115 S.Ct. 2144, 2149, 132 L.Ed.2d 226 (1995), the legislative history of the 1948 amendment to § 910(c) supports the interpretation that post-injury decline in the economy alone may not constitute the basis for finding that § 910(c), rather than subsection (a) or (b), applies to determine a claimant's average weekly wage.  A portion of the Senate Labor and Public Welfare Committee's report states:

Petitioners point to cases in which courts have applied subsection (c) and taken into account post-injury wage levels to compute average annual earnings which were higher than the earnings that would have been computed under either subsections (a) or (b). *See National Steel & Shipbuilding, Inc. v. Bonner,* 600 F.2d 1288 (9th Cir.1979); *Tri-State Terminals v. Jesse,* 596 F.2d 752 (7th Cir.1979). Neither decision supports petitioners' position. In *Bonner,* the claimant was injured shortly after starting a new, higher paying job, and neither party contested the application of § 910(c) to her claim. The Ninth Circuit approved the ALJ's focus on the higher wages claimant earned as a pipe fitter to determine her average annual earnings, rather than basing its decision on the wages she earned earlier in the year as a babysitter, noting that "[t]he trier can reasonably draw an inference that but for the injury, the worker would have continued to earn the new, higher wages." *Bonner,* 600 F.2d at 1293. In *Tri-State,* § 910(c) applied to determine the annual average wage because the claimants' work was "intermittent and discontinuous." *Tri-State,* 596 F.2d at 755. The Seventh Circuit rejected the employer's claim that in applying subsection (c), the court could only look at pre-injury earnings, finding that the Board properly considered the increased post-injury earnings of

---

Subsection (c) of section 10 of the act would be amended by section 4 of the bill so as to permit the inclusion of all earnings of the injured employee to be taken into account in determining the employee's annual earning capacity. This subsection in the present law is used where the employment itself, in which the injured employee was engaged when injured, does not afford a full year of work. It is also used where the workweek is shorter than 6 days (and would be used where such workweek is also shorter than 5 days under the proposed amendment to this section). Thus subsection (c) applies to seasonal, intermittent, discontinuous, and like employment which affords less than a full workyear or workweek. Under the present law the employee's wage for computation purposes under subdivision (c) is limited to his actual earnings, and those of like employees, ... The measurement of an employee's capacity to earn should not be limited to his earnings in the particular employment in which he was engaged when injured, but should be gaged [sic] by what the employee is capable of earning in all employments in which he was employed during the year prior to injury, otherwise harsh results necessarily follow. The proposed change in subsection (c) seeks to avoid such harsh results by permitting consideration of earnings of the employee not only in the employment engaged in when injured, but all other employments in which he worked during the year prior to injury, and is intended to be inclusive of the reasonable value of the employee's services if self-employed during part of such year.

S.Rep. No. 1315, 80th Cong., 2d Sess., Reprinted in (1948) U.S.Code Cong.Serv. pp. 1979, 1982-83, *quoted in Tri-State Terminals v. Jesse,* 596 F.2d 752, 758 n. 6 (7th Cir.1979).

co-workers in order to determine the claimants' "earning capacity"—i.e., "the potential and opportunity to earn absent injury." *Id.* at 757.[2]

Petitioners' position attempts to convert into a basis for applying § 910(c) what the courts in *Bonner* and *Tri-State* found to be proper factors to consider in determining annual average income pursuant to that provision. However, as this court has recognized, "application of section 10(c) is appropriate when the employee's work is inherently discontinuous or intermittent, ... and when " "otherwise harsh results" would follow were an employee's wages invariably calculated simply by looking at the previous year's earnings.' " *Empire United Stevedores v. Gatlin,* 936 F.2d 819, 822 (5th Cir.1991) (citations omitted). Mr. Barrios' work was not discontinuous or intermittent, and no harsh results will follow from determining his average annual wage based on his earnings during the year preceding his injury pursuant to § 910(a). As § 910(a) can fairly and reasonably be applied to determine Mr. Barrios' rate of compensation, the ALJ and the Board did not err in so doing.

B. *Award of Permanent Total Disability*

Petitioners also challenge the ALJ's finding of total and permanent disability on three grounds: (1) that the ALJ erred in reaching this issue as Mr. Barrios sought only temporary total disability payments; (2) that the evidence was insufficient to establish that Mr. Barrios was permanently and totally disabled; and (3) that there was an adequate showing of alternate employment. Initially, we note that petitioners' claim that the issue of permanent total disability was not properly presented is belied by petitioners' defense of the case, as counsel for petitioners clearly raised the permanency of

---

[2]The Supreme Court's recent decision in *Metropolitan Stevedore Company v. Rambo,* --- U.S. ----, 115 S.Ct. 2144, 132 L.Ed.2d 226 (1995), does not lend petitioners support. In that case, the compensation claimant's post-injury employment income exceeded his earnings prior to injury. The Court held that modification of a compensation award pursuant to 33 U.S.C. § 922 is not limited to situations in which the claimant's physical condition changes, but applies as well to situations when there is "a change in wage-earning capacity. A change in actual wages is controlling only when actual wages "fairly and reasonably represent ... wage-earning capacity.' " ---- U.S. at ----, 115 S.Ct. at 2150. The Court, however, expressly refrained from addressing whether purely economic shifts constitute a change in conditions within the meaning of § 922, observing that its "circumspect approach does not permit a change in wage-earning capacity with every variation in actual wages or transient change in the economy. There may be cases raising difficult questions as to what constitutes a change in wage-earning capacity, but we need not address them here." *Id.*

Mr. Barrios' disability as an issue at the hearing in this matter.[3] Moreover, petitioners' claim that that they did not call a vocational expert because of their belief at the hearing that a claim for total disability was not being pursued is specious, given the fact that the duration of a disability is a medical issue, not a vocational one. *See Louisiana Insurance Guaranty Association v. Abbott,* 40 F.3d 122, 125 (5th Cir.1994). Consequently, the ALJ did not err in reaching the issue of the permanency of Mr. Barrios' disability.

Petitioners challenge the ALJ's finding that Mr. Barrios is permanently disabled. A claimant under the LHWCA "is considered permanently disabled ... if he or she has any residual disability after reaching maximum medical improvement, the date of which is to be determined solely by medical evidence and is not dependent on economic factors." *Id.* Here, the ALJ observed that "[s]ince Claimant's condition is such that the disability has been lengthy, the time of recovery doubtful and indefinite, I conclude that Claimant reached maximum medical improvement as of July 15, 1986, near the time Claimant was released to return to light duty work on a trial basis." Petitioners argue that this finding is wrong because the medical testimony demonstrated that Mr. Barrios has yet to reach maximum medical improvement (and thus cannot be permanently disabled), as his bony spurs may be absorbed in time or corrected through surgery. This court has recognized that an employee is permanently disabled "when "his condition has continued for a lengthy period, and it appears to be of lasting or indefinite duration, as distinguished from one in which recovery merely awaits a normal healing period.' " *Id.* at 126 (quoting *Watson v. Gulf Stevedore Corp.,* 400 F.2d 649, 654 (5th Cir.1986), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1471, 22 L.Ed.2d 755 (1969)). Substantial evidence established that, at the time of the hearing in this matter, six and a half years had passed since Mr. Barrios was injured, he had been unable to work for almost the entire period following his injury, and that his condition had been declining since his doctor released him to work in 1986. We find no error

---

[3]The transcript of the hearing conducted on August 29, 1988, reflects that counsel for petitioners listed as an issue whether Mr. Barrios had reached maximum medical improvement and stated during his opening statement to the ALJ that "I don't think that this man has reach [sic] maximum medical improvement and I think that's going to be pretty clear from the deposition of Dr. Jackson, and I don't believe that under the Fifth Circuit law that this gentleman is permanent, that he has made a good claim for permanent and total disability."

in the ALJ's conclusion that under these circumstances, Mr. Barrios' disability is permanent in nature.

Petitioners also claim that the ALJ erred in finding that Mr. Barrios is totally disabled as they presented sufficient evidence of suitable alternate employment. Whereas the nature (or duration) of a claimant's disability presents a medical question, *Abbott,* 40 F.3d at 125, the degree of disability is evaluated principally in economic terms—the availability of suitable alternative employment distinguishes partial from total disability. *Id.,* at 126-27. Once a claimant has demonstrated that he is unable to perform his former longshore employment due to his job-related injury, he has made a *prima facie* case of total disability. *Id.* at 127. The burden then shifts to the employer to reduce or eliminate its compensation liability by establishing that the employee is (1) capable of performing (2) other realistically available jobs. *Id.* The ALJ found that the evidence petitioners introduced to show that claimant was capable of performing light-duty work at the time of his release by Dr. Jackson was inadequate to demonstrate that any such light duty work was available. The Board affirmed the ALJ's finding that petitioners did not demonstrate the availability of suitable employment due to their failure to show that such employment was actually available during the short period when Mr. Barrios was capable of performing light duty work following his medical release by Dr. Jackson's on June 18, 1986.[4] We have reviewed the record and agree that petitioners did not present sufficient proof to meet their burden of showing that suitable alternate employment was available to Mr. Barrios during the period in which he was physically capable of performing light-duty work. Consequently, we affirm the finding that Mr. Barrios is totally disabled.

### III. *Conclusion*

Because it correctly concluded that the ALJ's compensation order was supported by substantial evidence in the record, and that it was in accordance with the law, the decision of the Benefits Review Board is AFFIRMED.

---

[4]The Board determined, however, that the ALJ erred in finding petitioners' evidence inadequate because petitioners' vocational expert did not contact possible employers directly.